(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MICHIGAN *v.* BAY MILLS INDIAN COMMUNITY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 12–515. Argued December 2, 2013—Decided May 27, 2014

The State of Michigan, petitioner, entered into a compact with respondent Bay Mills Indian Community pursuant to the Indian Gaming Regulatory Act (IGRA). See 25 U. S. C. §2710(d)(1)(C). The compact authorizes Bay Mills to conduct class III gaming activities (*i.e.*, to operate a casino) on Indian lands located within the State's borders, but prohibits it from doing so outside that territory. Bay Mills later opened a second casino on land it had purchased through a congressionally established land trust. The Tribe claimed it could operate a casino there because the property qualified as Indian land. Michigan disagreed and sued the Tribe under §2710(d)(7)(A)(ii), which allows a State to enjoin "class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." The District Court granted the injunction, but the Sixth Circuit vacated. It held that tribal sovereign immunity barred the suit unless Congress provided otherwise, and that §2710(d)(7)(A)(ii) only authorized suits to enjoin gaming activity located "on Indian lands," whereas Michigan's complaint alleged the casino was outside such territory.

*Held*: Michigan's suit against Bay Mills is barred by tribal sovereign immunity. Pp. 4–21.

  (a) As "'domestic dependent nations,'" Indian tribes exercise "inherent sovereign authority" that is subject to plenary control by Congress. *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505, 509. Unless and "until Congress acts, the tribes retain" their historic sovereign authority. *United States* v. *Wheeler*, 435 U. S. 313, 323. Among the core aspects of sovereignty that tribes possess—subject to congressional action—is the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 58. That immunity applies

whether a suit is brought by a State, see, *e.g.*, *Puyallup Tribe, Inc.* v. *Department of Game of Wash.*, 433 U. S. 165, or arises from a tribe's commercial activities off Indian lands, see *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751. Therefore, unless Congress has "unequivocally" authorized Michigan's suit, *C & L Enterprises, Inc.* v. *Citizen Band Potawatomi Tribe of Okla.*, 532 U. S. 411, 418, it must be dismissed. Pp. 4–8.

(b) IGRA's plain terms do not authorize this suit. Section 2710(d)(7)(A)(ii) partially abrogates tribal immunity with respect to class III gaming located "on Indian lands," but the very premise of Michigan's suit is that Bay Mills' casino is unlawful because it is outside Indian lands. Michigan argues that the casino is authorized, licensed, and operated from within the reservation, and that such administrative action constitutes "class III gaming activity." However, numerous other IGRA provisions make clear that "class III gaming activity" refers to the gambling that goes on in a casino, not the offsite licensing of such games. See, *e.g.*, §§2710(d)(3)(C)(i), (d)(9). IGRA's history and design also explain why Congress would have authorized a State to enjoin illegal tribal gaming on Indian lands but not on lands subject to the State's own sovereign jurisdiction. Congress adopted IGRA in response to *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202, 221–222, which held that States lacked regulatory authority over gaming on Indian lands but left intact States' regulatory power over tribal gaming outside Indian territory. A State therefore has many tools to enforce its law on state land that it does not possess in Indian territory, including, *e.g.,* bringing a civil or criminal action against tribal officials rather than the tribe itself for conducting illegal gaming. A State can also use its leverage in negotiating an IGRA compact to bargain for a waiver of the tribe's immunity. Pp. 8–14.

(c) Michigan urges the Court to overrule *Kiowa* and hold that tribal immunity does not apply to commercial activity outside Indian territory. However, "any departure" from precedent "demands special justification," *Arizona* v. *Rumsey*, 467 U. S. 203, 212, and Michigan offers nothing more than arguments already rejected in *Kiowa*. *Kiowa* rejected these arguments because it is fundamentally Congress's job to determine whether or how to limit tribal immunity; Congress had restricted tribal immunity "in limited circumstances" like §2710(d)(7)(A)(ii), while "in other statutes" declaring an "intention not to alter it." 523 U. S., at 758. *Kiowa* therefore chose to "defer to the role Congress may wish to exercise in this important judgment." *Ibid.* Congress has since reflected on *Kiowa* and decided to retain tribal immunity in a case like this. Having held that the issue is up to Congress, the Court cannot reverse itself now simply because some

Syllabus

may think Congress's conclusion wrong. Pp. 14–21.

695 F. 3d 406, affirmed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, and SOTOMAYOR, JJ., joined. SOTOMAYOR, J., filed a concurring opinion. SCALIA, J., filed a dissenting opinion. THOMAS, J., filed a dissenting opinion, in which SCALIA, GINSBURG, and ALITO, JJ., joined. GINSBURG, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–515

MICHIGAN, PETITIONER *v.* BAY MILLS INDIAN COMMUNITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[May 27, 2014]

JUSTICE KAGAN delivered the opinion of the Court.

The question in this case is whether tribal sovereign immunity bars Michigan's suit against the Bay Mills Indian Community for opening a casino outside Indian lands. We hold that immunity protects Bay Mills from this legal action. Congress has not abrogated tribal sovereign immunity from a State's suit to enjoin gaming off a reservation or other Indian lands. And we decline to revisit our prior decisions holding that, absent such an abrogation (or a waiver), Indian tribes have immunity even when a suit arises from off-reservation commercial activity. Michigan must therefore resort to other mechanisms, including legal actions against the responsible individuals, to resolve this dispute.

I

The Indian Gaming Regulatory Act (IGRA or Act), 102 Stat. 2467, 25 U. S. C. §2701 *et seq.*, creates a framework for regulating gaming activity on Indian lands.[1]   See

---

[1] The Act defines "Indian lands" as "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held

§2702(3) (describing the statute's purpose as establishing "regulatory authority . . . [and] standards for gaming on Indian lands"). The Act divides gaming into three classes. Class III gaming, the most closely regulated and the kind involved here, includes casino games, slot machines, and horse racing. See §2703(8). A tribe may conduct such gaming on Indian lands only pursuant to, and in compliance with, a compact it has negotiated with the surrounding State. See §2710(d)(1)(C). A compact typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms. See §§2710(d)(3)(C)(ii), (v). Notable here, IGRA itself authorizes a State to bring suit against a tribe for certain conduct violating a compact: Specifically, §2710(d)(7)(A)(ii) allows a State to sue in federal court to "enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect."

Pursuant to the Act, Michigan and Bay Mills, a federally recognized Indian Tribe, entered into a compact in 1993. See App. to Pet. for Cert. 73a–96a. The compact empowers Bay Mills to conduct class III gaming on "Indian lands"; conversely, it prohibits the Tribe from doing so outside that territory. *Id.*, at 78a, 83a; see n. 1, *supra.* The compact also contains a dispute resolution mechanism, which sends to arbitration any contractual differences the parties cannot settle on their own. See App. to Pet. for Cert. 89a–90a. A provision within that arbitration section states that "[n]othing in this Compact shall be deemed a waiver" of either the Tribe's or the State's sovereign immunity. *Id.*, at 90a. Since entering into the com-

_____

in trust by the United States for the benefit of any Indian tribe or individual[,] or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." §2703(4).

pact, Bay Mills has operated class III gaming, as author-
ized, on its reservation in Michigan's Upper Peninsula.

In 2010, Bay Mills opened another class III gaming
facility in Vanderbilt, a small village in Michigan's Lower
Peninsula about 125 miles from the Tribe's reservation.
Bay Mills had bought the Vanderbilt property with ac-
crued interest from a federal appropriation, which Con-
gress had made to compensate the Tribe for 19th-century
takings of its ancestral lands. See Michigan Indian Land
Claims Settlement Act, 111 Stat. 2652. Congress had
directed that a portion of the appropriated funds go into a
"Land Trust" whose earnings the Tribe was to use to
improve or purchase property. According to the legisla-
tion, any land so acquired "shall be held as Indian lands
are held." §107(a)(3), *id.*, at 2658. Citing that provision,
Bay Mills contended that the Vanderbilt property was
"Indian land" under IGRA and the compact; and the Tribe
thus claimed authority to operate a casino there.

Michigan disagreed: The State sued Bay Mills in federal
court to enjoin operation of the new casino, alleging that
the facility violated IGRA and the compact because it was
located outside Indian lands. The same day Michigan filed
suit, the federal Department of the Interior issued an
opinion concluding (as the State's complaint said) that the
Tribe's use of Land Trust earnings to purchase the Van-
derbilt property did not convert it into Indian territory.
See App. 69–101. The District Court entered a prelimi-
nary injunction against Bay Mills, which promptly shut
down the new casino and took an interlocutory appeal.
While that appeal was pending, Michigan amended its
complaint to join various tribal officials as defendants, as
well as to add state law and federal common law claims.
The Court of Appeals for the Sixth Circuit then vacated
the injunction, holding (among other things) that tribal
sovereign immunity barred Michigan's suit against Bay
Mills unless Congress provided otherwise, and that

§2710(d)(7)(A)(ii) did not authorize the action.  See 695 F. 3d 406, 413–415 (2012).  That provision of IGRA, the Sixth Circuit reasoned, permitted a suit against the Tribe to enjoin only gaming activity located *on* Indian lands, whereas the State's complaint alleged that the Vanderbilt casino was *outside* such territory.  See *id.*, at 412.[2]  Accordingly, the Court of Appeals concluded that Michigan could proceed, if at all, solely against the individual defendants, and it remanded to the District Court to consider those claims.  See *id.*, at 416–417.[3]  Although no injunction is currently in effect, Bay Mills has not reopened the Vanderbilt casino.

We granted certiorari to consider whether tribal sovereign immunity bars Michigan's suit against Bay Mills, 570 U. S. __ (2013), and we now affirm the Court of Appeals' judgment.

II

Indian tribes are "'domestic dependent nations'" that exercise "inherent sovereign authority."  *Oklahoma Tax*

_____

[2] The Sixth Circuit framed part of its analysis in jurisdictional terms, holding that the District Court had no authority to consider Michigan's IGRA claim because §2710(d)(7)(A)(ii) provides federal jurisdiction only over suits to enjoin gaming on Indian lands (and Michigan's suit was not that).  See 695 F. 3d, at 412–413.  That reasoning is wrong, as all parties agree.  See Brief for Michigan 22–25; Brief for Bay Mills 23–24; Brief for United States as *Amicus Curiae* 16–17.  The general federal-question statute, 28 U. S. C. §1331, gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA.  Nothing in §2710(d)(7)(A)(ii) or any other provision of IGRA limits that grant of jurisdiction (although those provisions may indicate that a party has no statutory right of action).  See *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 643–644 (2002).

[3] The Court of Appeals' decision applied not only to Michigan's case, but also to a consolidated case brought by the Little Traverse Bay Bands of Odawa Indians, which operates a casino about 40 miles from the Vanderbilt property.  Little Traverse subsequently dismissed its suit, rather than seek review in this Court.

*Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505, 509 (1991) (*Potawatomi*) (quoting *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831)). As dependents, the tribes are subject to plenary control by Congress. See *United States* v. *Lara,* 541 U. S. 193, 200 (2004) ("[T]he Constitution grants Congress" powers "we have consistently described as 'plenary and exclusive'" to "legislate in respect to Indian tribes"). And yet they remain "separate sovereigns pre-existing the Constitution." *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56 (1978). Thus, unless and "until Congress acts, the tribes retain" their historic sovereign authority. *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978).

Among the core aspects of sovereignty that tribes possess—subject, again, to congressional action—is the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo*, 436 U. S., at 58. That immunity, we have explained, is "a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 476 U. S. 877, 890 (1986); cf. The Federalist No. 81, p. 511 (B. Wright ed. 1961) (A. Hamilton) (It is "inherent in the nature of sovereignty not to be amenable" to suit without consent). And the qualified nature of Indian sovereignty modifies that principle only by placing a tribe's immunity, like its other governmental powers and attributes, in Congress's hands. See *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506, 512 (1940) (*USF&G*) ("It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit"). Thus, we have time and again treated the "doctrine of tribal immunity [as] settled law" and dismissed any suit against a tribe absent congressional authorization (or a waiver). *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751, 756 (1998).

In doing so, we have held that tribal immunity applies

no less to suits brought by States (including in their own courts) than to those by individuals. First in *Puyallup Tribe, Inc.* v. *Department of Game of Wash.*, 433 U. S. 165, 167–168, 172–173 (1977), and then again in *Potawatomi*, 498 U. S., at 509–510, we barred a State seeking to enforce its laws from filing suit against a tribe, rejecting arguments grounded in the State's own sovereignty. In each case, we said a State must resort to other remedies, even if they would be less "efficient." *Id.*, at 514; see *Kiowa*, 523 U. S., at 755 ("There is a difference between the right to demand compliance with state laws and the means available to enforce them"). That is because, as we have often stated (and contrary to the dissent's novel pronouncement, see *post*, at 3 (opinion of THOMAS, J.) (hereinafter the dissent)), tribal immunity "is a matter of federal law and is not subject to diminution by the States." 523 U. S., at 756 (citing *Three Affiliated Tribes*, 476 U. S., at 891; *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 154 (1980)). Or as we elsewhere explained: While each State at the Constitutional Convention surrendered its immunity from suit by sister States, "it would be absurd to suggest that the tribes"—at a conference "to which they were not even parties"—similarly ceded their immunity against state-initiated suits. *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 782 (1991).

Equally important here, we declined in *Kiowa* to make any exception for suits arising from a tribe's commercial activities, even when they take place off Indian lands. In that case, a private party sued a tribe in state court for defaulting on a promissory note. The plaintiff asked this Court to confine tribal immunity to suits involving conduct on "reservations or to noncommercial activities." 523 U. S., at 758. We said no. We listed *Puyallup*, *Potawatomi*, and *USF&G* as precedents applying immunity to a suit predicated on a tribe's commercial conduct—

respectively, fishing, selling cigarettes, and leasing coal mines. 523 U. S., at 754–755. Too, we noted that *Puyallup* involved enterprise "both on and off [the Tribe's] reservation." 523 U. S., at 754 (quoting 433 U. S., at 167). "[O]ur precedents," we thus concluded, have not previously "drawn the[ ] distinctions" the plaintiff pressed in the case. 523 U. S., at 755. They had established a broad principle, from which we thought it improper suddenly to start carving out exceptions. Rather, we opted to "defer" to Congress about whether to abrogate tribal immunity for off-reservation commercial conduct. *Id.,* at 758, 760; see *infra,* at 17–18.

Our decisions establish as well that such a congressional decision must be clear. The baseline position, we have often held, is tribal immunity; and "[t]o abrogate [such] immunity, Congress must 'unequivocally' express that purpose." *C & L Enterprises, Inc.* v. *Citizen Band Potawatomi Tribe of Okla.,* 532 U. S. 411, 418 (2001) (quoting *Santa Clara Pueblo,* 436 U. S., at 58). That rule of construction reflects an enduring principle of Indian law: Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government. See, *e.g., id.,* at 58–60; *Iowa Mut. Ins. Co.* v. *LaPlante,* 480 U. S. 9, 18 (1987); *United States* v. *Dion,* 476 U. S. 734, 738–739 (1986).

The upshot is this: Unless Congress has authorized Michigan's suit, our precedents demand that it be dismissed.[4] And so Michigan, naturally enough, makes two arguments: first, that IGRA indeed abrogates the Tribe's immunity from the State's suit; and second, that if it does not, we should revisit—and reverse—our decision in

—————

[4] Michigan does not argue here that Bay Mills waived its immunity from suit. Recall that the compact expressly preserves both the Tribe's and the State's sovereign immunity. See *supra,* at 2.

*Kiowa*, so that tribal immunity no longer applies to claims arising from commercial activity outside Indian lands. We consider—and reject—each contention in turn.

## III

IGRA partially abrogates tribal sovereign immunity in §2710(d)(7)(A)(ii)—but this case, viewed most naturally, falls outside that term's ambit. The provision, as noted above, authorizes a State to sue a tribe to "enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." See *supra*, at 2; *Kiowa*, 523 U. S., at 758 (citing the provision as an example of legislation "restrict[ing] tribal immunity from suit in limited circumstances"). A key phrase in that abrogation is "on Indian lands"—three words reflecting IGRA's overall scope (and repeated some two dozen times in the statute). A State's suit to enjoin gaming activity *on* Indian lands (assuming other requirements are met, see n. 6, *infra*) falls within §2710(d)(7)(A)(ii); a similar suit to stop gaming activity *off* Indian lands does not. And that creates a fundamental problem for Michigan. After all, the very premise of this suit—the reason Michigan thinks Bay Mills is acting unlawfully—is that the Vanderbilt casino is *outside* Indian lands. See App. to Pet. for Cert. 59a–60a. By dint of that theory, a suit to enjoin gaming in Vanderbilt is correspondingly outside §2710(d)(7)(A)(ii)'s abrogation of immunity.

Michigan first attempts to fit this suit within §2710(d)(7)(A)(ii) by relocating the "class III gaming activity" to which it is objecting. True enough, Michigan states, the Vanderbilt casino lies outside Indian lands. But Bay Mills "authorized, licensed, and operated" that casino from within its own reservation. Brief for Michigan 20. According to the State, that necessary administrative action—no less than, say, dealing craps—is "class III gaming activity," and because it occurred on Indian land, this suit to

enjoin it can go forward.

But that argument comes up snake eyes, because numerous provisions of IGRA show that "class III gaming activity" means just what it sounds like—the stuff involved in playing class III games. For example, §2710(d)(3)(C)(i) refers to "the licensing and regulation of [a class III gaming] activity" and §2710(d)(9) concerns the "operation of a class III gaming activity." Those phrases make perfect sense if "class III gaming activity" is what goes on in a casino—each roll of the dice and spin of the wheel. But they lose all meaning if, as Michigan argues, "class III gaming activity" refers equally to the off-site licensing or operation of the games. (Just plug in those words and see what happens.) See also §§2710(b)(2)(A), (b)(4)(A), (c)(4), (d)(1)(A) (similarly referring to class II or III "gaming activity"). The same holds true throughout the statute. Section 2717(a)(1) specifies fees to be paid by "each gaming operation that conducts a class II or class III gaming activity"—signifying that the gaming activity is the gambling in the poker hall, not the proceedings of the off-site administrative authority. And §§2706(a)(5) and 2713(b)(1) together describe a federal agency's power to "clos[e] a gaming activity" for "substantial violation[s]" of law—*e.g.,* to shut down crooked blackjack tables, not the tribal regulatory body meant to oversee them. Indeed, consider IGRA's very first finding: Many tribes, Congress stated, "have licensed gaming activities on Indian lands," thereby necessitating federal regulation. §2701(1). The "gaming activit[y]" is (once again) the gambling. And that means §2710(d)(7)(A)(ii) does not allow Michigan's suit even if Bay Mills took action on its reservation to license or oversee the Vanderbilt facility.

Stymied under §2710(d)(7)(A)(ii), Michigan next urges us to adopt a "holistic method" of interpreting IGRA that would allow a State to sue a tribe for illegal gaming off, no less than on, Indian lands. Brief for Michigan 30. Michi-

gan asks here that we consider "IGRA's text and structure as a whole." *Id.*, at 28. But (with one briefly raised exception) Michigan fails to identify any specific textual or structural features of the statute to support its proposed result.[5] Rather, Michigan highlights a (purported) anomaly of the statute as written: that it enables a State to sue a tribe for illegal gaming inside, but not outside, Indian country. "[W]hy," Michigan queries, "would Congress authorize a state to obtain a federal injunction against illegal tribal gaming on Indian lands, but not on lands subject to the state's own sovereign jurisdiction?" Reply Brief 1. That question has no answer, Michigan argues: Whatever words Congress may have used in IGRA, it could not have intended that senseless outcome. See Brief for Michigan 28.

But this Court does not revise legislation, as Michigan proposes, just because the text as written creates an apparent anomaly as to some subject it does not address. Truth be told, such anomalies often arise from statutes, if

_____

[5]Michigan's single reference to another statutory provision, 18 U. S. C. §1166, does not advance its argument, because that term includes a geographical limitation similar to the one appearing in §2710(d)(7)(A)(ii). Section 1166 makes a State's gambling laws applicable "in Indian country" as federal law, and then gives the Federal Government "exclusive jurisdiction over criminal prosecutions" for violating those laws. 18 U. S. C. §1166(a), (d). Michigan briefly argues that, by negative implication, §1166 gives a State the power "to bring a *civil* suit to enforce [its] anti-gambling laws in Indian country," and that this power applies "even when the defendant is an Indian tribe." Brief for Michigan 26 (emphasis added). Bay Mills and the United States vigorously contest both those propositions, arguing that §1166 gives States no civil enforcement authority at all, much less as against a tribe. See Brief for Bay Mills 30–31; Brief for United States as *Amicus Curiae* 20–22. But that dispute is irrelevant here. Even assuming Michigan's double inference were valid, §1166 would still allow a State to sue a tribe for gaming only "in Indian country." So Michigan's suit, alleging that illegal gaming occurred on *state* lands, could no more proceed under §1166 than under §2710(d)(7)(A)(ii).

for no other reason than that Congress typically legislates by parts—addressing one thing without examining all others that might merit comparable treatment. Rejecting a similar argument that a statutory anomaly (between property and non-property taxes) made "not a whit of sense," we explained in one recent case that "Congress wrote the statute it wrote"—meaning, a statute going so far and no further. See *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 17–18). The same could be said of IGRA's abrogation of tribal immunity for gaming "on Indian lands." This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that (in Michigan's words) Congress "must have intended" something broader. Brief for Michigan 32. And still less do we have that warrant when the consequence would be to expand an abrogation of immunity, because (as explained earlier) "Congress must 'unequivocally' express [its] purpose" to subject a tribe to litigation. *C & L Enterprises*, 532 U. S., at 418; see *supra*, at 7.

In any event, IGRA's history and design provide a more than intelligible answer to the question Michigan poses about why Congress would have confined a State's authority to sue a tribe as §2710(d)(7)(A)(ii) does. Congress adopted IGRA in response to this Court's decision in *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202, 221–222 (1987), which held that States lacked any regulatory authority over gaming on Indian lands. *Cabazon* left fully intact a State's regulatory power over tribal gaming outside Indian territory—which, as we will soon show, is capacious. See *infra*, at 12–13. So the problem Congress set out to address in IGRA (*Cabazon*'s ouster of state authority) arose in Indian lands alone. And the solution Congress devised, naturally enough, reflected that fact. See, *e.g., Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 58 (1996) ("[T]he Act grants the States a power that they

would not otherwise have, viz., some measure of author-
ity over gaming on Indian lands"). Everything—literally
everything—in IGRA affords tools (for either state or
federal officials) to regulate gaming on Indian lands, and
nowhere else. Small surprise that IGRA's abrogation of
tribal immunity does that as well.[6]

And the resulting world, when considered functionally,
is not nearly so "enigma[tic]" as Michigan suggests. Reply
Brief 1. True enough, a State lacks the ability to sue a
tribe for illegal gaming when that activity occurs off the
reservation. But a State, on its own lands, has many
other powers over tribal gaming that it does not possess
(absent consent) in Indian territory. Unless federal law
provides differently, "Indians going beyond reservation
boundaries" are subject to any generally applicable state
law. See *Wagnon* v. *Prairie Band Potawatomi Nation*, 546
U. S. 95, 113 (2005) (quoting *Mescalero Apache Tribe* v.
*Jones*, 411 U. S. 145, 148 (1973)). So, for example, Michi-
gan could, in the first instance, deny a license to Bay Mills
for an off-reservation casino. See Mich. Comp. Laws Ann.

———————

[6] Indeed, the statutory abrogation does not even cover all suits to
enjoin gaming on Indian lands, thus refuting the very premise of
Michigan's argument-from-anomaly. Section 2710(d)(7)(A)(ii), recall,
allows a State to sue a tribe not for all "class III gaming activity located
on Indian lands" (as Michigan suggests), but only for such gaming as is
"conducted in violation of any Tribal-State compact . . . that is in effect."
Accordingly, if a tribe opens a casino on Indian lands before negotiating
a compact, the surrounding State cannot sue; only the Federal Gov-
ernment can enforce the law. See 18 U. S. C. §1166(d). To be precise,
then, IGRA's authorization of suit mirrors not the full problem *Cabazon*
created (a vacuum of state authority over gaming in Indian country)
but, more particularly, Congress's "carefully crafted" compact-based
solution to that difficulty. *Seminole Tribe of Fla.* v. *Florida*, 517 U. S.
44, 73–74 (1996). So Michigan's binary challenge—if a State can sue to
stop gaming in Indian country, why not off?—fails out of the starting
gate. In fact, a State *cannot* sue to enjoin all gaming in Indian country;
that gaming must, in addition, violate an agreement that the State and
tribe have mutually entered.

§§432.206–432.206a (West 2001). And if Bay Mills went ahead anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license. See §432.220; see also §600.3801(1)(a) (West 2013) (designating illegal gambling facilities as public nuisances). As this Court has stated before, analogizing to *Ex parte Young*, 209 U. S. 123 (1908), tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct. See *Santa Clara Pueblo*, 436 U. S., at 59. And to the extent civil remedies proved inadequate, Michigan could resort to its criminal law, prosecuting anyone who maintains—or even frequents—an unlawful gambling establishment. See Mich. Comp. Laws Ann. §§432.218 (West 2001), 750.303, 750.309 (West 2004). In short (and contrary to the dissent's unsupported assertion, see *post*, at 11), the panoply of tools Michigan can use to enforce its law on its own lands—no less than the suit it could bring on Indian lands under §2710(d)(7)(A)(ii)—can shutter, quickly and permanently, an illegal casino.[7]

Finally, if a State really wants to sue a tribe for gaming outside Indian lands, the State need only bargain for a waiver of immunity. Under IGRA, a State and tribe negotiating a compact "may include . . . remedies for breach of contract," 25 U. S. C. §2710(d)(3)(C)(v)—including a provision allowing the State to bring an action against the tribe in the circumstances presented here. States have more

_____

[7] Michigan contends that these alternative remedies may be more intrusive on, or less respectful of, tribal sovereignty than the suit it wants to bring. See Brief for Michigan 15; Tr. of Oral Arg. 18. Bay Mills, which presumably is better positioned to address that question, emphatically disagrees. See *id.,* at 32–33. And the law supports Bay Mills' position: Dispensing with the immunity of a sovereign for fear of pursuing available remedies against its officers or other individuals would upend all known principles of sovereign immunity.

than enough leverage to obtain such terms because a tribe cannot conduct class III gaming on its lands without a compact, see §2710(d)(1)(C), and cannot sue to enforce a State's duty to negotiate a compact in good faith, see *Seminole Tribe*, 517 U. S., at 47 (holding a State immune from such suits). So as Michigan forthrightly acknowledges, "a party dealing with a tribe in contract negotiations has the power to protect itself by refusing to deal absent the tribe's waiver of sovereign immunity from suit." Brief for Michigan 40. And many States have taken that path. See Brief for Seminole Tribe of Florida et al. as *Amici Curiae* 12–22 (listing compacts with waivers of tribal immunity). To be sure, Michigan did not: As noted earlier, the compact at issue here, instead of authorizing judicial remedies, sends disputes to arbitration and expressly retains each party's sovereign immunity. See *supra*, at 2. But Michigan—like any State—could have insisted on a different deal (and indeed may do so now for the future, because the current compact has expired and remains in effect only until the parties negotiate a new one, see Tr. of Oral Arg. 21). And in that event, the limitation Congress placed on IGRA's abrogation of tribal immunity—whether or not anomalous as an abstract matter—would have made no earthly difference.

IV

Because IGRA's plain terms do not abrogate Bay Mills' immunity from this suit, Michigan (and the dissent) must make a more dramatic argument: that this Court should "revisit[ ] *Kiowa*'s holding" and rule that tribes "have no immunity for illegal commercial activity outside their sovereign territory." Reply Brief 8, 10; see *post*, at 1. Michigan argues that tribes increasingly participate in off-reservation gaming and other commercial activity, and operate in that capacity less as governments than as private businesses. See Brief for Michigan 38 (noting,

among other things, that "tribal gaming revenues have more than tripled" since *Kiowa*).  Further, Michigan contends, tribes have broader immunity from suits arising from such conduct than other sovereigns—most notably, because Congress enacted legislation limiting foreign nations' immunity for commercial activity in the United States.  See *id.*, at 41; 28 U. S. C. §1605(a)(2).  It is time, Michigan concludes, to "level[ ] the playing field."  Brief for Michigan 38.

But this Court does not overturn its precedents lightly. *Stare decisis*, we have stated, "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."  *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991).  Although "not an inexorable command," *id.*, at 828, *stare decisis* is a foundation stone of the rule of law, necessary to ensure that legal rules develop "in a principled and intelligible fashion," *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986).  For that reason, this Court has always held that "any departure" from the doctrine "demands special justification."  *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984).

And that is more than usually so in the circumstances here.  First, *Kiowa* itself was no one-off: Rather, in rejecting the identical argument Michigan makes, our decision reaffirmed a long line of precedents, concluding that "the doctrine of tribal immunity"—without any exceptions for commercial or off-reservation conduct—"is settled law and controls this case."  523 U. S., at 756; see *id.*, at 754–755; *supra,* at 5–7.  Second, we have relied on *Kiowa* subsequently: In another case involving a tribe's off-reservation commercial conduct, we began our analysis with *Kiowa*'s holding that tribal immunity applies to such activity (and then found that the Tribe had waived its protection).  See *C & L Enterprises*, 532 U. S., at 418.  Third, tribes across

the country, as well as entities and individuals doing business with them, have for many years relied on *Kiowa* (along with its forebears and progeny), negotiating their contracts and structuring their transactions against a backdrop of tribal immunity. As in other cases involving contract and property rights, concerns of *stare decisis* are thus "at their acme." *State Oil Co.* v. *Khan*, 522 U. S. 3, 20 (1997). And fourth (a point we will later revisit, see *infra*, at 17–20), Congress exercises primary authority in this area and "remains free to alter what we have done"— another factor that gives "special force" to *stare decisis*. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). To overcome all these reasons for this Court to stand pat, Michigan would need an ace up its sleeve.[8]

But instead, all the State musters are retreads of assertions we have rejected before. *Kiowa* expressly considered the view, now offered by Michigan, that "when tribes take part in the Nation's commerce," immunity "extends beyond what is needed to safeguard tribal self-governance." 523 U. S., at 758. (Indeed, as *Kiowa* noted, see *id.*, at 757, *Potawatomi* had less than a decade earlier rejected Oklahoma's identical contention that "because tribal business activities . . . are now so detached from traditional tribal interests," immunity "no longer makes sense in [the commercial] context," 498 U. S., at 510.) So too, the *Kiowa*

—————

[8] Adhering to *stare decisis* is particularly appropriate here given that the State, as we have shown, has many alternative remedies: It has no need to sue the Tribe to right the wrong it alleges. See *supra*, at 12–13. We need not consider whether the situation would be different if no alternative remedies were available. We have never, for example, specifically addressed (nor, so far as we are aware, has Congress) whether immunity should apply in the ordinary way if a tort victim, or other plaintiff who has not chosen to deal with a tribe, has no alternative way to obtain relief for off-reservation commercial conduct. The argument that such cases would present a "special justification" for abandoning precedent is not before us. *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984).

Court comprehended the trajectory of tribes' commercial activity (which is the dissent's exclusive rationale for ignoring *stare decisis*, see *post*, at 10–13). In the preceding decade, tribal gaming revenues had increased more than thirty fold[9] (dwarfing the still strong rate of growth since that time, see *supra*, at 14–15); and *Kiowa* noted the flourishing of other tribal enterprises, ranging from cigarette sales to ski resorts, see 523 U. S., at 758. Moreover, the *Kiowa* Court understood that other sovereigns did not enjoy similar immunity for commercial activities outside their territory; that seeming "anomal[y]" was a principal point in the dissenting opinion. See *id.*, at 765 (Stevens, J., dissenting). *Kiowa* did more, in fact, than acknowledge those arguments; it expressed a fair bit of sympathy toward them. See *id.*, at 758 (noting "reasons to doubt the wisdom of perpetuating the doctrine" as to off-reservation commercial conduct). Yet the decision could not have been any clearer: "We decline to draw [any] distinction" that would "confine [immunity] to reservations or to noncommercial activities." *Ibid.*

We ruled that way for a single, simple reason: because it is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity. The special brand of sovereignty the tribes retain—both its nature and its extent—rests in the hands of Congress. See *Lara*, 541 U. S., at 200; *Wheeler*, 435 U. S., at 323. *Kiowa* chose to respect that congressional responsibility (as *Potawatomi* had a decade earlier) when it rejected the precursor to Michigan's argument: Whatever our view of the merits, we explained, "we defer to the role Congress may wish to exercise in this important judgment." 523 U. S., at 758; see *Potawatomi*, 498 U. S., at 510 (stating that because

––––––––
[9] See Nat. Gambling Impact Study Comm'n, Final Report, pp. 6–1 to 6–2 (1999), online at http://govinfo.library.unt.edu/ngisc/reports/6.pdf (as visited Apr. 30, 2014, and available in Clerk of Court's case file).

"Congress has always been at liberty to dispense with" or limit tribal immunity, "we are not disposed to modify" its scope). Congress, we said—drawing an analogy to its role in shaping foreign sovereign immunity[10]—has the greater capacity "to weigh and accommodate the competing policy concerns and reliance interests" involved in the issue. 523 U. S., at 759. And Congress repeatedly had done just that: It had restricted tribal immunity "in limited circumstances" (including, we noted, in §2710(d)(7)(A)(ii)), while "in other statutes" declaring an "intention not to alter" the doctrine. *Id.*, at 758; see *Potawatomi*, 498 U. S., at 510 (citing statutory provisions involving tribal immunity). So too, we thought, Congress should make the call whether to curtail a tribe's immunity for off-reservation commercial conduct—and the Court should accept Congress's judgment.

All that we said in *Kiowa* applies today, with yet one

----

[10] *Kiowa* explained that Congress, in the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §1605(a)(2), "den[ied] immunity for the commercial acts of a foreign nation," codifying an earlier State Department document, known as the Tate Letter, announcing that policy. 523 U. S., at 759. Michigan takes issue with *Kiowa*'s account, maintaining that this Court took the lead in crafting the commercial exception to foreign sovereign immunity, and so should feel free to do the same thing here. See Reply Brief 6–7. But the decision Michigan cites, *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U. S. 682 (1976), does not show what the State would like. First, Michigan points to a part of the *Dunhill* opinion commanding only four votes, see *id.*, at 695–706 (opinion of White, J.); the majority's decision was based on the act of state doctrine, not on anything to do with foreign sovereign immunity, see *id.,* at 690–695. And second, even the plurality opinion relied heavily on the views of the Executive Branch as expressed in the Tate Letter—going so far as to attach that document as an appendix. See *id.,* at 696–698 (opinion of White, J.); *id.*, at 711–715 (appendix 2 to opinion of the Court). The opinion therefore illustrates what *Kiowa* highlighted: this Court's historic practice of "deferr[ing] to the decisions of the political branches," rather than going it alone, when addressing foreign sovereign immunity. *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983).

more thing: Congress has now reflected on *Kiowa* and made an initial (though of course not irrevocable) decision to retain that form of tribal immunity. Following *Kiowa*, Congress considered several bills to substantially modify tribal immunity in the commercial context. Two in particular—drafted by the chair of the Senate Appropriations Subcommittee on the Interior—expressly referred to *Kiowa* and broadly abrogated tribal immunity for most torts and breaches of contract. See S. 2299, 105th Cong., 2d Sess. (1998); S. 2302, 105th Cong., 2d Sess. (1998). But instead of adopting those reversals of *Kiowa*, Congress chose to enact a far more modest alternative requiring tribes either to disclose or to waive their immunity in contracts needing the Secretary of the Interior's approval. See Indian Tribal Economic Development and Contract Encouragement Act of 2000, §2, 114 Stat. 46 (codified at 25 U. S. C. §81(d)(2)); see also F. Cohen, Handbook of Federal Indian Law §7.05[1][b], p. 643 (2012). Since then, Congress has continued to exercise its plenary authority over tribal immunity, specifically preserving immunity in some contexts and abrogating it in others, but never adopting the change Michigan wants.[11] So rather than confronting, as we did in *Kiowa*, a legislative vacuum as to the precise issue presented, we act today against the backdrop of a congressional choice: to retain tribal immunity (at least for now) in a case like this one.[12]

––––––––––

[11] Compare, *e.g.*, Prevent All Cigarette Trafficking Act of 2009, §§2(e), (3)(a), 124 Stat. 1101, 1108 (preserving immunity), with Arizona Water Settlements Act, §§213(a)(2), 301, 118 Stat. 3531, 3551 (abrogating immunity). The dissent's claim that "Congress has never granted tribal sovereign immunity in *any* shape or form," *post*, at 13, apparently does not take into account the many statutes in which Congress preserved or otherwise ratified tribal immunity. See, *e.g.*, 25 U. S. C. §450n; see generally *Potawatomi*, 498 U. S., at 510 ("Congress has consistently reiterated its approval of the immunity doctrine").

[12] The dissent principally counters that this history is not "relevan[t]" because *Kiowa* was a "common-law decision." *Post*, at 14. But that is

Reversing *Kiowa* in these circumstances would scale the heights of presumption: Beyond upending "long-established principle[s] of tribal sovereign immunity," that action would replace Congress's considered judgment with our contrary opinion. *Potawatomi*, 498 U. S., at 510. As *Kiowa* recognized, a fundamental commitment of Indian law is judicial respect for Congress's primary role in defining the contours of tribal sovereignty. See 523 U. S., at 758–760; see also *Santa Clara Pueblo*, 436 U. S., at 60 ("[A] proper respect . . . for the plenary authority of Congress in this area cautions that [the courts] tread lightly"); Cohen, *supra*, §2.01[1], at 110 ("Judicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law"). That commitment gains only added force when Congress has already reflected on an issue of tribal sovereignty, including immunity from suit, and declined to change settled law. And that force must grow greater still when Congress considered that issue partly at our urging. See *Kiowa*, 523 U. S., at 758 (hinting, none too subtly, that "Congress may wish to exercise" its authority over the question presented). Having held in *Kiowa* that this issue is up to Congress, we cannot reverse ourselves because some may think its conclusion wrong. Congress of course may always change its mind—and we would readily defer to that new decision. But it is for Congress, now more than ever, to say whether to create an exception to tribal immunity for off-reservation commercial activity. As in *Kiowa*—except still

———————

to ignore what *Kiowa* (in line with prior rulings) specifically told Congress: that tribal immunity, far from any old common law doctrine, lies in Congress's hands to configure. See 523 U. S., at 758; *Potawatomi*, 498 U. S., at 510; *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 58–60 (1978). When we inform Congress that it has primary responsibility over a sphere of law, and invite Congress to consider a specific issue within that sphere, we cannot deem irrelevant how Congress responds.

more so—"we decline to revisit our case law[,] and choose" instead "to defer to Congress." *Id.*, at 760.

## V

As "domestic dependent nations," Indian tribes exercise sovereignty subject to the will of the Federal Government. *Cherokee Nation*, 5 Pet., at 17. Sovereignty implies immunity from lawsuits. Subjection means (among much else) that Congress can abrogate that immunity as and to the extent it wishes. If Congress had authorized this suit, Bay Mills would have no valid grounds to object. But Congress has not done so: The abrogation of immunity in IGRA applies to gaming on, but not off, Indian lands. We will not rewrite Congress's handiwork. Nor will we create a freestanding exception to tribal immunity for all off-reservation commercial conduct. This Court has declined that course once before. To choose it now would entail both overthrowing our precedent and usurping Congress's current policy judgment. Accordingly, Michigan may not sue Bay Mills to enjoin the Vanderbilt casino, but must instead use available alternative means to accomplish that object.

We affirm the Sixth Circuit's judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–515

_____

## MICHIGAN, PETITIONER *v.* BAY MILLS INDIAN COMMUNITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 27, 2014]

JUSTICE SOTOMAYOR, concurring.

The doctrine of tribal immunity has been a part of American jurisprudence for well over a century. See, *e.g., Parks* v. *Ross*, 11 How. 362 (1851); Struve, Tribal Immunity and Tribal Courts, 36 Ariz. St. L. J. 137, 148–155 (2004) (tracing the origins of the doctrine to the mid-19th century); Wood, It Wasn't An Accident: The Tribal Sovereign Immunity Story, 62 Am. U. L. Rev. 1587, 1640–1641 (2013) (same). And in more recent decades, this Court has consistently affirmed the doctrine. See, *e.g., United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506 (1940); *Puyallup Tribe, Inc.* v. *Department of Game of Wash.*, 433 U. S. 165 (1977); *C & L Enterprises, Inc.* v. *Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U. S. 411, 418 (2001). Despite this history, the principal dissent chides the Court for failing to offer a sufficient basis for the doctrine of tribal immunity, *post*, at 3 (opinion of THOMAS, J.), and reasons that we should at least limit the doctrine of tribal sovereign immunity in ways that resemble restrictions on foreign sovereign immunity.

The majority compellingly explains why *stare decisis* and deference to Congress' careful regulatory scheme require affirming the decision below. I write separately to further detail why both history and comity counsel against limiting Tribes' sovereign immunity in the manner the

principal dissent advances.

## I

Long before the formation of the United States, Tribes "were self-governing sovereign political communities." *United States* v. *Wheeler*, 435 U. S. 313, 322–323 (1978). And Tribes "have not given up their full sovereignty." *Id.,* at 323. Absent contrary congressional acts, Tribes "retain their existing sovereign powers" and "possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *Ibid.* See also 25 U. S. C. §1301(1) (affirming Tribes' continued "powers of self-government"). In this case then, the question is what type of immunity federal courts should accord to Tribes, commensurate with their retained sovereignty.

In answering this question, the principal dissent analogizes tribal sovereign immunity to foreign sovereign immunity. Foreign sovereigns (unlike States) are generally not immune from suits arising from their commercial activities. *Post*, at 4; see also Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §1605(a)(2) (commercial-activity exception to foreign sovereign immunity). This analogy, however, lacks force. Indian Tribes have never historically been classified as "foreign" governments in federal courts even when they asked to be.

The case of *Cherokee Nation* v. *Georgia*, 5 Pet. 1 (1831), is instructive. In 1828 and 1829, the Georgia Legislature enacted a series of laws that purported to nullify acts of the Cherokee government and seize Cherokee land, among other things. *Id.*, at 7–8. The Cherokee Nation sued Georgia in this Court, alleging that Georgia's laws violated federal law and treaties. *Id.*, at 7. As the constitutional basis for jurisdiction, the Tribe relied on Article III, §2, cl. 1, which extends the federal judicial power to cases "between a state, or the citizens thereof, and foreign states,

citizens, or subjects." 5 Pet., at 15 (internal quotation marks omitted). But this Court concluded that it lacked jurisdiction because Tribes were not "foreign state[s]." *Id.*, at 20. The Court reasoned that "[t]he condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence." *Id.,* at 16. Tribes were more akin to "domestic dependent nations," the Court explained, than to foreign nations. *Id.*, at 17. We have repeatedly relied on that characterization in subsequent cases. See, *e.g., Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505, 509 (1991); *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 141 (1982). Two centuries of jurisprudence therefore weigh against treating Tribes like foreign visitors in American courts.

## II

The principal dissent contends that whenever one sovereign is sued in the courts of another, the question whether to confer sovereign immunity is not a matter of right but rather one of "comity." *Post,* at 3. But in my view, the premise leads to a different conclusion than the one offered by the dissent. Principles of comity strongly counsel in favor of continued recognition of tribal sovereign immunity, including for off-reservation commercial conduct.

Comity—"that is, 'a proper respect for [a sovereign's] functions,'" *Sprint Communications, Inc.* v. *Jacobs*, 571 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 7)—fosters "respectful, harmonious relations" between governments, *Wood* v. *Milyard*, 566 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 7). For two reasons, these goals are best served by recognizing sovereign immunity for Indian Tribes, including immunity for off-reservation conduct, except where Congress has expressly abrogated it. First, a legal rule that permitted States to sue Tribes, absent their consent, for commercial

conduct would be anomalous in light of the existing prohibitions against Tribes' suing States in like circumstances. Such disparate treatment of these two classes of domestic sovereigns would hardly signal the Federal Government's respect for tribal sovereignty. Second, Tribes face a number of barriers to raising revenue in traditional ways. If Tribes are ever to become more self-sufficient, and fund a more substantial portion of their own governmental functions, commercial enterprises will likely be a central means of achieving that goal.

### A

We have held that Tribes may not sue States in federal court, *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775 (1991), including for commercial conduct that chiefly impacts Indian reservations, *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996). In *Seminole Tribe*, the Tribe sued the State of Florida in federal court under the Indian Gaming Regulatory Act (IGRA)—the same statute petitioner relies on here. The suit alleged that Florida had breached its statutory "duty to negotiate in good faith with [the Tribe] toward the formation of a [gaming] compact." *Id.,* at 47. This Court held that state sovereign immunity prohibited such a suit.

Importantly, the Court barred the Tribe's suit against Florida even though the case involved the State's conduct in the course of commercial negotiations. As this Court later observed, relying in part on *Seminole Tribe*, the doctrine of state sovereign immunity is not "any less robust" when the case involves conduct "that is undertaken for profit, that is traditionally performed by private citizens and corporations, and that otherwise resembles the behavior of 'market participants.'" *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 684 (1999). Nor did *Seminole Tribe* adopt a state corollary to the "off-reservation" exception to tribal

sovereign immunity that the principal dissent urges today. To the contrary, the negotiations in *Seminole Tribe* concerned gaming on Indian lands, not state lands.

As the principal dissent observes, "comity is about one sovereign respecting the dignity of another." *Post*, at 4. This Court would hardly foster respect for the dignity of Tribes by allowing States to sue Tribes for commercial activity on State lands, while prohibiting Tribes from suing States for commercial activity on Indian lands. Both States and Tribes are domestic governments who come to this Court with sovereignty that they have not entirely ceded to the Federal Government.

Similar asymmetry would result if States could sue Tribes in state courts.[1] In *Nevada* v. *Hicks*, 533 U. S. 353, 355 (2001), this Court considered whether a tribal court had "jurisdiction over civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." It held that the tribal court did not. *Id.,* at 374. In reaching that conclusion, the Court observed that "[s]tate sovereignty does not end at a reservation's border." *Id.,* at 361. And relying on similar principles, some federal courts have more explicitly held that tribal courts may not entertain suits against States. See, *e.g., Montana* v. *Gilham*, 133 F. 3d 1133, 1136–1137 (CA9 1998) (holding that while neither "the Eleventh Amendment [n]or congressional act" barred suits against States in tribal courts, "the inherent sovereign powers of the States" barred such suits). To the extent Tribes are barred from suing in tribal courts, it would be anomalous to permit suits against Tribes in state courts.

Two of the dissenting opinions implicitly address this

---

[1] While this case involves a suit against a Tribe in federal court, the principal dissent also critiques tribal sovereign immunity in state courts. *Post*, at 4–5.

asymmetry.  The principal dissent reasons that States and Tribes should be treated differently for purposes of sovereign immunity because—unlike tribal sovereign immunity—state sovereign immunity has constitutional origins. *Post,* at 3, n. 1.  JUSTICE GINSBURG offers another view: that Tribes and States should both receive less immunity. She expresses concerns about cases like *Seminole Tribe,* pointing to dissents that have catalogued the many problems associated with the Court's sprawling state sovereign immunity jurisprudence.  *Post,* at 1–2 (citing, among others, *Alden* v. *Maine,* 527 U. S. 706, 814 (1999) (Souter, J., dissenting)).

As things stand, however, *Seminole Tribe* and its progeny remain the law.  And so long as that is so, comity would be ill-served by unequal treatment of States and Tribes.  If Tribes cannot sue States for commercial activities on tribal lands, the converse should also be true.  Any other result would fail to respect the dignity of Indian Tribes.

B

The principal dissent contends that Tribes have emerged as particularly "substantial and successful" commercial actors.  *Post,* at 13.  The dissent expresses concern that, although tribal leaders can be sued for prospective relief, *ante,* at 13 (majority opinion), Tribes' purportedly growing coffers remain unexposed to broad damages liability.  *Post,* at 10–11.  These observations suffer from two flaws.

First, not all Tribes are engaged in highly lucrative commercial activity.  Nearly half of federally recognized Tribes in the United States do not operate gaming facilities at all.  A. Meister, Casino City's Indian Gaming Industry Report 28 (2009–2010 ed.) (noting that "only 237, or 42 percent, of the 564 federally recognized Native

American tribes in the U. S. operate gaming").[2]  And even among the Tribes that do, gaming revenue is far from uniform.  As of 2009, fewer than 20% of Indian gaming facilities accounted for roughly 70% of the revenues from such facilities.  *Ibid.*  One must therefore temper any impression that Tribes across the country have suddenly and uniformly found their treasuries filled with gaming revenue.

Second, even if all Tribes were equally successful in generating commercial revenues, that would not justify the commercial-activity exception urged by the principal dissent.  For tribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions.  A key goal of the Federal Government is to render Tribes more self-sufficient, and better positioned to fund their own sovereign functions, rather than relying on federal funding.  25 U. S. C. §2702(1) (explaining that Congress' purpose in enacting IGRA was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments"); see also Cohen's Handbook of Federal Indian Law 1357–1373 (2012) (Cohen's Handbook) (describing various types of federal financial assistance that Tribes receive).  And tribal business operations are critical to the goals of tribal self-sufficiency because such enterprises in some cases "may be the only means by which a tribe can raise revenues," Struve, 36 Ariz. St. L. J., at 169.  This is due in large part to the insuperable (and often state-imposed) barriers Tribes face in raising revenue through more

_____

[2] The term "'Indian gaming facility' is defined as any tribal enterprise that offer[s] gaming in accordance with [the Indian Gaming Regulation Act].'" A. Meister, Casino City's Indian Gaming Industry Report 10 (2009–2010 ed.).

traditional means.

For example, States have the power to tax certain individuals and companies based on Indian reservations, making it difficult for Tribes to raise revenue from those sources. See *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505 (allowing State to collect taxes on sales to non-Indians on Indian land); *Arizona Dept. of Revenue* v. *Blaze Constr. Co.*, 526 U. S. 32 (1999) (allowing taxation of companies owned by non-Indians on Indian land); *Thomas* v. *Gay*, 169 U. S. 264 (1898) (allowing taxation of property owned by non-Indians on Indian land). States may also tax reservation land that Congress has authorized individuals to hold in fee, regardless of whether it is held by Indians or non-Indians. See *Cass County* v. *Leech Lake Band of Chippewa Indians*, 524 U. S. 103 (1998) (States may tax Indian reservation land if Congress made the land subject to sale under the Indian General Allotment Act of 1887 (also known as the Dawes Act)); *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251 (1992) (same).

As commentators have observed, if Tribes were to impose their own taxes on these same sources, the resulting double taxation would discourage economic growth. Fletcher, In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue, 80 N. D. L. Rev. 759, 771 (2004); see also Cowan, Double Taxation in Indian Country: Unpacking the Problem and Analyzing the Role of the Federal Government in Protecting Tribal Governmental Revenues, 2 Pittsburgh Tax Rev. 93, 95 (2005); Enterprise Zones, Hearings before the Subcommittee on Select Revenue Measures of the House Committee On Ways and Means, 102d Cong., 1st Sess., 234 (1991) (statement of Peterson Zah, President of the Navajo Nation) ("[D]ouble taxation interferes with our ability to encourage economic activity and to develop effective reve-

nue generating tax programs. Many businesses may find it easier to avoid doing business on our reservations rather than . . . bear the brunt of an added tax burden").

If non-Indians controlled only a small amount of property on Indian reservations, and if only a negligible amount of land was held in fee, the double-taxation concern might be less severe. But for many Tribes, that is not the case. History explains why this is so: Federal policies enacted in the late 19th and early 20th centuries rendered a devastating blow to tribal ownership. In 1887, Congress enacted the Dawes Act. 24 Stat. 388. That Act had two major components relevant here. First, it converted the property that belonged to Indian Tribes into fee property, and allotted the land to individual Indians. *Id.,* at 388–389. Much of this land passed quickly to non-Indian owners. Royster, The Legacy of Allotment, 27 Ariz. St. L. J. 1, 12 (1995). Indeed, by 1934, the amount of land that passed from Indian Tribes to non-Indians totaled 90 million acres. See Cohen's Handbook 74. Other property passed to non-Indians when destitute Indians found themselves unable to pay state taxes, resulting in sheriff's sales. Royster, *supra,* at 12.

A second component of the Dawes Act opened "surplus" land on Indian reservations to settlement by non-Indians. 24 Stat. 389–390. Selling surplus lands to non-Indians was part of a more general policy of forced assimilation. See Cohen's Handbook 75. Sixty million acres of land passed to non-Indian hands as a result of surplus programs. Royster, *supra,* at 13.[3]

These policies have left a devastating legacy, as the cases that have come before this Court demonstrate. We

_____

[3] This figure does not include land taken from Indian Tribes after World War II; during that time, some Tribes and reservations were liquidated and given to non-Indians. A. Debo, A History of Indians of the United States 301–312 (1970).

noted in *Montana* v. *United States*, 450 U. S. 544, 548 (1981), for example, that due in large part to the Dawes Act, 28% of the Crow Tribe's reservation in Montana was held in fee by non-Indians.  Similarly, Justice White observed in *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 414 (1989) (plurality opinion), that 20% of the Yakima Nation's reservation was owned in fee.  For reservations like those, it is particularly impactful that States and local governments may tax property held by non-Indians, *Thomas*, 169 U. S., at 264–265, and land held in fee as a result of the Dawes Act.  See *County of Yakima*, 502 U. S., at 259.

Moreover, Tribes are largely unable to obtain substantial revenue by taxing tribal members who reside on non-fee land that was not allotted under the Dawes Act.  As one scholar recently observed, even if Tribes imposed high taxes on Indian residents, "there is very little income, property, or sales they could tax."  Fletcher, *supra,* at 774.  The poverty and unemployment rates on Indian reservations are significantly greater than the national average.  See n. 4, *infra.*  As a result, "there is no stable tax base on most reservations."  Fletcher*, supra,* at 774; see Williams, Small Steps on the Long Road to Self-Sufficiency for Indian Nations: The Indian Tribal Governmental Tax Status Act of 1982, 22 Harv. J. Legis. 335, 385 (1985).

To be sure, poverty has decreased over the past few decades on reservations that have gaming activity.  One recent study found that between 1990 and 2000, the presence of a tribal casino increased average per capita income by 7.4% and reduced the family poverty rate by 4.9 percentage points.  Anderson, Tribal Casino Impacts on American Indians Well-Being: Evidence From Reservation-Level Census Data, 31 Contemporary Economic Policy 291, 298 (Apr. 2013).  But even reservations that have gaming continue to experience significant poverty, especially relative to the national average.  See *id.,* at 296.

The same is true of Indian reservations more generally.[4]

*    *    *

Both history and proper respect for tribal sovereignty—or comity—counsel against creating a special "commercial activity" exception to tribal sovereign immunity. For these reasons, and for the important reasons of *stare decisis* and deference to Congress outlined in the majority opinion, I concur.

––––––––––

[4] See Dept. of Interior, Office of Assistant Secretary–Indian Affairs, 2013 American Indian Population and Labor Force Report 11 (Jan. 16, 2014) (placing the poverty rate among American Indians at 23%); see also Dept. of Commerce, Bureau of Census, Press Release, Income, Poverty and Health Insurance Coverage in the United States: 2010 (Sept. 13, 2011) stating that the national poverty rate in 2010 was 15.1%), online at http://www.census.gov/newsroom/releases/ archives/income_wealth/cb13-165.html (as visited May 22, 2014, and available in Clerk of Court's Case file).

# SUPREME COURT OF THE UNITED STATES

No. 12–515

MICHIGAN, PETITIONER *v.* BAY MILLS INDIAN COMMUNITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[May 27, 2014]

JUSTICE SCALIA, dissenting.

In *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751 (1998), this Court expanded the judge-invented doctrine of tribal immunity to cover off-reservation commercial activities. *Id.,* at 760. I concurred in that decision. For the reasons given today in JUSTICE THOMAS's dissenting opinion, which I join, I am now convinced that *Kiowa* was wrongly decided; that, in the intervening 16 years, its error has grown more glaringly obvious; and that *stare decisis* does not recommend its retention. Rather than insist that Congress clean up a mess that I helped make, I would overrule *Kiowa* and reverse the judgment below.

# SUPREME COURT OF THE UNITED STATES

No. 12–515

MICHIGAN, PETITIONER *v.* BAY MILLS INDIAN
COMMUNITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 27, 2014]

JUSTICE THOMAS, with whom JUSTICE SCALIA, JUSTICE
GINSBURG, and JUSTICE ALITO join, dissenting.

In *Kiowa Tribe of Okla.* v. *Manufacturing Technologies,
Inc.*, 523 U. S. 751 (1998), this Court extended the judge-
made doctrine of tribal sovereign immunity to bar suits
arising out of an Indian tribe's commercial activities con-
ducted outside its territory. That was error. Such an
expansion of tribal immunity is unsupported by any ra-
tionale for that doctrine, inconsistent with the limits on
tribal sovereignty, and an affront to state sovereignty.

That decision, wrong to begin with, has only worsened
with the passage of time. In the 16 years since *Kiowa*,
tribal commerce has proliferated and the inequities en-
gendered by unwarranted tribal immunity have multi-
plied. Nevertheless, the Court turns down a chance to
rectify its error. Still lacking a substantive justification
for *Kiowa*'s rule, the majority relies on notions of deference
to Congress and *stare decisis*. Because those considera-
tions do not support (and cannot sustain) *Kiowa*'s unjusti-
fiable rule and its mounting consequences, I respectfully
dissent.

## I

### A

There is no substantive basis for *Kiowa*'s extension of

tribal immunity to off-reservation commercial acts. As this Court explained in *Kiowa*, the common-law doctrine of tribal sovereign immunity arose "almost by accident." *Id.,* at 756. The case this Court typically cited as the doctrine's source "simply does not stand for that proposition," *ibid.* (citing *Turner* v. *United States*, 248 U. S. 354 (1919)), and later cases merely "reiterated the doctrine" "with little analysis," 523 U. S., at 757. In fact, far from defending the doctrine of tribal sovereign immunity, the *Kiowa* majority "doubt[ed] the wisdom of perpetuating the doctrine." *Id.,* at 758. The majority here suggests just one *post hoc* justification: that tribes automatically receive immunity as an incident to their historic sovereignty. But that explanation fails to account for the fact that immunity does not apply of its own force in the courts of another sovereign. And none of the other colorable rationales for the doctrine—*i.e.*, considerations of comity, and protection of tribal self-sufficiency and self-government—supports extending immunity to suits arising out of a tribe's commercial activities conducted beyond its territory.

1

Despite the Indian tribes' subjection to the authority and protection of the United States Government, this Court has deemed them "domestic dependent nations" that retain limited attributes of their historic sovereignty. *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831); see also *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978) ("The sovereignty that the Indian tribes retain is of a unique and limited character"). The majority suggests that tribal immunity is one such attribute of sovereignty that tribes have retained. See *ante,* at 5; Brief for Respondent Bay Mills Indian Community 48; On that view, immunity from suit applies automatically, on the theory that it is simply "inherent in the nature of sovereignty," The Federalist No. 81, p. 548 (J. Cooke ed. 1961).

This basis for immunity—the only substantive basis the majority invokes—is unobjectionable when a tribe raises immunity as a defense in its own courts. We have long recognized that in the sovereign's own courts, "the sovereign's power to determine the jurisdiction of its own courts and to define the substantive legal rights of its citizens adequately explains the lesser authority to define its own immunity." *Kiowa, supra*, at 760 (Stevens, J., dissenting) (citing *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353 (1907)). But this notion cannot support a tribe's claim of immunity in the courts of another sovereign—either a State (as in *Kiowa*) or the United States (as here). Sovereign immunity is not a freestanding "right" that applies of its own force when a sovereign faces suit in the courts of another. *Republic of Austria* v. *Altmann*, 541 U. S. 677, 688 (2004). Rather, "[t]he sovereign's claim to immunity in the courts of a second sovereign . . . normally depends on the second sovereign's law." *Kiowa, supra*, at 760–761 (Stevens, J., dissenting); see, *e.g., Altmann, supra*, at 711 (BREYER, J., concurring) (application of foreign sovereign immunity "is a matter, not of legal right, but of 'grace and comity'").[1] In short, to the extent an Indian tribe may claim immunity in federal or state court, it is because federal or state law provides it, not merely because the tribe is sovereign. Outside of tribal courts, the majority's

―――――――――

[1] State sovereign immunity is an exception: This Court has said that the States' immunity from suit in federal court is secured by the Constitution. See *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 73 (2000) ("[F]or over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States"); *Alden* v. *Maine*, 527 U. S. 706, 733 (1999) ("Although the sovereign immunity of the States derives at least in part from the common-law tradition, . . . the immunity exists today by constitutional design"). Unlike the States, Indian tribes "are not part of this constitutional order," and their immunity is not guaranteed by it. *United States* v. *Lara*, 541 U. S. 193, 219 (2004) (THOMAS, J., concurring in judgment).

inherent-immunity argument is hardly persuasive.

2

Immunity for independent foreign nations in federal courts is grounded in international "comity," *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983), *i.e.,* respecting the dignity of other sovereigns so as not to ""'" imperil the amicable relations between governments and vex the peace of nations,"'" *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 418 (1964). But whatever its relevance to tribal immunity, comity is an ill-fitting justification for extending immunity to tribes' off-reservation commercial activities. Even with respect to fully sovereign foreign nations, comity has long been discarded as a sufficient reason to grant immunity for commercial acts. In 1976, Congress provided that foreign states are not immune from suits based on their "commercial activity" in the United States or abroad. Foreign Sovereign Immunities Act, 28 U. S. C. §1605(a)(2); see also *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U. S. 682, 703–704 (1976) (plurality opinion of White, J., joined by Burger, C. J., and Powell and Rehnquist, JJ.) ("Subjecting foreign governments to the rule of law in their commercial dealings" is "unlikely to touch very sharply on 'national nerves,'" because "[i]n their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns").

There is a further reason that comity cannot support tribal immunity for off-reservation commercial activities. At bottom, comity is about one sovereign respecting the dignity of another. See *Nevada* v. *Hall*, 440 U. S. 410, 416 (1979). But permitting immunity for a tribe's off-reservation acts represents a substantial affront to a different set of sovereigns—the States, whose sovereignty is guaranteed by the Constitution, see *New York* v. *United States*, 505 U. S. 144, 188 (1992) ("The Constitution . . .

'leaves to the several States a residuary and inviolable sovereignty'" (quoting The Federalist No. 39, at 256)). When an Indian tribe engages in commercial activity outside its own territory, it necessarily acts within the territory of a sovereign State. This is why, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148–149 (1973). A rule barring all suits against a tribe arising out of a tribe's conduct within state territory—whether private actions or (as here) actions brought by the State itself—stands in stark contrast to a State's broad regulatory authority over Indians within its own territory. Indeed, by foreclosing key mechanisms upon which States depend to enforce their laws against tribes engaged in off-reservation commercial activity, such a rule effects a breathtaking pre-emption of state power. *Kiowa*, 523 U. S., at 764 (Stevens, J., dissenting). What is worse, because that rule of immunity also applies in state courts, it strips the States of their prerogative "to decide for themselves whether to accord such immunity to Indian tribes as a matter of comity." *Id.*, at 760 (same). The States may decide whether to grant immunity in their courts to *other sovereign States*, see *Hall*, *supra*, at 417–418 (a State's immunity from suit in the courts of a second State depends on whether the second has chosen to extend immunity to the first "as a matter of comity"), but when it comes to Indian tribes, this Court has taken that right away. *Kiowa, supra,* at 765 (Stevens, J., dissenting).

Nor does granting tribes immunity with respect to their commercial conduct in state territory serve the practical aim of comity: allaying friction between sovereigns. See *Banco Nacional de Cuba, supra*, at 417–418. We need look no further than this case (and many others cited by petitioner and *amici* States) to see that such broad immunity

has only aggravated relationships between States and tribes throughout the country. See *infra*, at 11–13; see generally Brief for State of Alabama et al. 11–16; Brief for State of Oklahoma 8–10, 12–15.

3

This Court has previously suggested that recognizing tribal immunity furthers a perceived congressional goal of promoting tribal self-sufficiency and self-governance. See *Kiowa, supra*, at 757; *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 476 U. S. 877, 890 (1986). Whatever the force of this assertion as a general matter, it is easy to reject as a basis for extending tribal immunity to off-reservation commercial activities. In *Kiowa* itself, this Court dismissed the self-sufficiency rationale as "inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities." 523 U. S., at 757–758. The Court expressed concern that "[i]n this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." *Id.*, at 758.

Nor is immunity for off-reservation commercial acts necessary to protect tribal self-governance. As the *Kiowa* majority conceded, "[i]n our interdependent and mobile society, . . . tribal immunity extends beyond what is needed to safeguard tribal self-governance." *Ibid.* Such broad immunity far exceeds the modest scope of tribal sovereignty, which is limited only to "what is necessary to protect tribal self-government or to control internal relations." *Montana* v. *United States*, 450 U. S. 544, 564 (1981); see also *Nevada* v. *Hicks*, 533 U. S. 353, 392 (2001) (O'Connor, J., concurring in part and concurring in judgment) ("[T]ribes retain sovereign interests in activities that occur on land owned and controlled by the tribe . . ."). And no

party has suggested that immunity from the isolated suits that may arise out of extraterritorial commercial dealings is somehow fundamental to protecting tribal government or regulating a tribe's internal affairs.

## B

Despite acknowledging that there is scant substantive justification for extending tribal immunity to off-reservation commercial acts, this Court did just that in *Kiowa.* See 523 U. S., at 758. The *Kiowa* majority admitted that the Court—rather than Congress—"has taken the lead in drawing the bounds of tribal immunity." *Id.,* at 759. Nevertheless, the Court adopted a rule of expansive immunity purportedly to "defer to the role Congress may wish to exercise in this important judgment." *Id.,* at 758.

This asserted "deference" to Congress was a fiction and remains an enigma, however, because the *Kiowa* Court did not actually leave to Congress the decision whether to extend tribal immunity. Tribal immunity is a common-law doctrine adopted and shaped by this Court. *Oklahoma Tax Comm'n* v. *Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505, 510 (1991); *Kiowa*, 523 U. S., at 759. Before *Kiowa*, we had never held that tribal sovereign immunity applied to off-reservation commercial activities.[2] Thus, faced with an unresolved question about a common-law doctrine of its own design, the *Kiowa* Court had to

—————

[2] The Court in *Kiowa* noted that in one case, we upheld a claim of immunity where "a state court had asserted jurisdiction over tribal fishing 'both on and off its reservation.'" 523 U. S., at 754 (quoting *Puyallup Tribe, Inc.* v. *Department of Game of Wash.*, 433 U. S. 165, 167 (1977)). It went on to admit, however, that *Puyallup* "did not discuss the relevance of where the fishing had taken place." 523 U. S., at 754. And, as Justice Stevens explained in dissent, that case was about whether the state courts had jurisdiction to regulate fishing activities *on* the reservation; "we had no occasion to consider the validity of an injunction relating solely to off-reservation fishing." *Id.,* at 763.

make a choice: tailor the immunity to the realities of their commercial enterprises, or "grant . . . virtually unlimited tribal immunity." *Id.,* at 764 (Stevens, J., dissenting). The Court took the latter course. In doing so, it did not "defe[r] to Congress or exercis[e] 'caution,'—rather, it . . . creat[ed] law." *Id.*, at 765 (citation omitted). To be sure, Congress had the power to "alter" that decision if it wanted. *Id.*, at 759 (majority opinion). But Congress has the authority to do that with respect to any nonconstitutional decision involving federal law, and the mere existence of this authority could not be the basis for choosing one outcome over another in *Kiowa*.[3]

Accident or no, it was this Court, not Congress, that adopted the doctrine of tribal sovereign immunity in the first instance. And it was this Court that left open a question about its scope. Why should Congress—and only Congress, according to the *Kiowa* Court—have to take on a problem this Court created? In other areas of federal common law, until Congress intervenes, it is up to us to correct our errors. See, *e.g., Exxon Shipping Co.* v. *Baker*, 554 U. S. 471, 507 (2008) ("[I]f, in the absence of legislation, judicially derived standards leave the door open to outlier punitive-damages awards [in maritime law], it is hard to see how the judiciary can wash its hands of a

———————————

[3] Nor did the *Kiowa* Court "defer" to any pre-existing congressional policy choices. As I have already made clear, the rule the Court chose in *Kiowa* was divorced from, and in some ways contrary to any federal interest. See Part I–A, *supra*; see also *Kiowa*, 523 U. S., at 765 (Stevens, J., dissenting). And the rule is a "strikingly anomalous" departure from the immunities of other sovereigns in federal and state court. *Ibid.* (observing that *Kiowa* conferred on Indian tribes "broader immunity than the States, the Federal Government, and foreign nations"); see also Florey, Indian Country's Borders: Territoriality, Immunity, and the Construction of Tribal Sovereignty, 51 Boston College L. Rev. 595, 627 (2010) (After *Kiowa*, "the actual contours of [tribal immunity] remain astonishingly broad").

problem it created, simply by calling quantified standards legislative"); *National Metropolitan Bank* v. *United States*, 323 U. S. 454, 456 (1945) ("[I]n the absence of an applicable Act of Congress, federal courts must fashion the governing rules" in commercial-paper cases affecting the rights and liabilities of the United States). We have the same duty here.

## II

Today, the Court reaffirms *Kiowa.* Unsurprisingly, it offers no new substantive defense for *Kiowa*'s indefensible view of tribal immunity. Instead, the majority relies on a combination of the *Kiowa* Court's purported deference to Congress and considerations of *stare decisis.* I have already explained why it was error to ground the *Kiowa* rule in deference to Congress. I turn now to *stare decisis.* Contrary to the majority's claim, that policy does not require us to preserve this Court's mistake in *Kiowa.* The Court's failure to justify *Kiowa*'s rule and the decision's untoward consequences outweigh the majority's arguments for perpetuating the error.

## A

*Stare decisis* may sometimes be "the preferred course," but as this Court acknowledges, it is "not an inexorable command." *Payne* v. *Tennessee*, 501 U. S. 808, 827, 828 (1991). "[W]hen governing decisions are unworkable or are badly reasoned," *id.*, at 827, or "experience has pointed up the precedent's shortcomings," *Pearson* v. *Callahan*, 555 U. S. 223, 233 (2009), "'this Court has never felt constrained to follow precedent,'" *Payne*, *supra*, at 827. See also *Gulfstream Aerospace Corp.* v. *Mayacamas Corp.*, 485 U. S. 271, 282–283 (1988) (overruling precedent as "deficient in utility and sense," "unsound in theory, unworkable and arbitrary in practice, and unnecessary to achieve any legitimate goals"). The discussion above explains why

*Kiowa* was unpersuasive on its own terms. Now, the adverse consequences of that decision make it even more untenable.

In the 16 years since *Kiowa*, the commercial activities of tribes have increased dramatically. This is especially evident within the tribal gambling industry. Combined tribal gaming revenues in 28 States have more than tripled—from $8.5 billion in 1998 to $27.9 billion in 2012. National Indian Gaming Commission, 2012 Indian Gaming Revenues Increase 2.7 Percent (July 23, 2013), online at http://www.nigc.gov/LinkClick.aspx?fileticket=Fhd5shyZ1fM%3D (all Internet materials as visited May 2, 2014, and available in Clerk of Court's case file). But tribal businesses extend well beyond gambling and far past reservation borders. In addition to ventures that take advantage of on-reservation resources (like tourism, recreation, mining, forestry, and agriculture), tribes engage in "domestic and international business ventures" including manufacturing, retail, banking, construction, energy, telecommunications, and more. Graham, An Interdisciplinary Approach to American Indian Economic Development, 80 N. D. L. Rev. 597, 600–604 (2004). Tribal enterprises run the gamut: they sell cigarettes and prescription drugs online; engage in foreign financing; and operate greeting cards companies, national banks, cement plants, ski resorts, and hotels. *Ibid.*; see also, *e.g.,* The Harvard Project on American Indian Economic Development, The State of the Native Nations 124 (2008) (Ho-Chunk, Inc., a tribal corporation of the Winnebago Tribe of Nebraska, operates "hotels in Nebraska and Iowa," "numerous retail grocery and convenience stores," a "tobacco and gasoline distribution company," and "a temporary labor service provider"); Four Fires, San Manuel Band of Mission Indians, http://www.sanmanuel-nsn.gov/fourfires.php.html) (four Tribes from California and Wisconsin jointly own and operate a $43 million hotel in Washington, D. C.). These manifold com-

mercial enterprises look the same as any other—except immunity renders the tribes largely litigation-proof.

As the commercial activity of tribes has proliferated, the conflict and inequities brought on by blanket tribal immunity have also increased. Tribal immunity significantly limits, and often extinguishes, the States' ability to protect their citizens and enforce the law against tribal businesses. This case is but one example: No one can seriously dispute that Bay Mills' operation of a casino outside its reservation (and thus within Michigan territory) would violate both state law and the Tribe's compact with Michigan. Yet, immunity poses a substantial impediment to Michigan's efforts to halt the casino's operation permanently. The problem repeats itself every time a tribe fails to pay state taxes, harms a tort victim, breaches a contract, or otherwise violates state laws, and tribal immunity bars the only feasible legal remedy. Given the wide reach of tribal immunity, such scenarios are commonplace.[4] See, *e.g., Oneida Indian Nation of New York* v. *Madison Cty.*, 605 F. 3d 149, 163 (CA2 2010) (Cabranes, J., joined by Hall, J., concurring) ("The holding in this case comes down to this: an Indian tribe can purchase land (including land that was never part of a reservation); refuse

--------

[4] Lower courts have held that tribal immunity shields not only Indian tribes themselves, but also entities deemed "arms of the tribe." See, *e.g., Breakthrough Management Group, Inc.* v. *Chukchansi Gold Casino & Resort*, 629 F. 3d 1173, 1191–1195 (CA10 2010) (casino and economic development authority were arms of the Tribe); *Memphis Biofuels, LLC* v. *Chickasaw Nation Industries, Inc.*, 585 F. 3d 917, 921 (CA6 2009) (tribal conglomerate was an arm of the Tribe). In addition, tribal immunity has been interpreted to cover tribal employees and officials acting within the scope of their employment. See, *e.g., Cook* v. *AVI Casino Enterprises, Inc.*, 548 F. 3d 718, 726–727 (CA9 2008); *Native American Distributing* v. *Seneca-Cayuga Tobacco Co.*, 546 F. 3d 1288, 1296 (CA10 2008); *Chayoon* v. *Chao*, 355 F. 3d 141, 143 (CA2 2004) (*per curiam*); *Tamiami Partners, Ltd.* v. *Miccosukee Tribe of Indians of Fla.*, 177 F. 3d 1212, 1225–1226 (CA11 1999).

to pay lawfully-owed taxes; and suffer no consequences because the taxing authority cannot sue to collect the taxes owed"); see also *Furry* v. *Miccosukee Tribe of Indians of Fla.*, 685 F. 3d 1224 (CA11 2012) (Tribe immune from a suit arising out of a fatal off-reservation car crash that alleged negligence and violation of state dram shop laws); *Native American Distributing* v. *Seneca-Cayuga Tobacco Co.*, 546 F. 3d 1288 (CA10 2008) (tribal officials and a tobacco-products manufacturer were immune from a suit brought by a national distributor alleging breach of contract and interstate market manipulation); *Tonasket* v. *Sargent*, 830 F. Supp. 2d 1078 (ED Wash. 2011) (tribal immunity foreclosed an action against the Tribe for illegal price fixing, antitrust violations, and unfair competition), aff'd, 510 Fed. Appx. 648 (CA9 2013); *Multimedia Games, Inc.* v. *WLGC Acquisition Corp.*, 214 F. Supp. 2d 1131 (ND Okla. 2001) (tribal immunity barred a suit alleging copyright infringement, unfair competition, breach of contract, and other claims against a tribal business development agency).

In the wake of *Kiowa*, tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality. Martin & Schwartz, The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk? 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012). Indian tribes have also created conflict in certain States by asserting tribal immunity as a defense against violations of state campaign finance laws. See generally Moylan, Sovereign Rules of the Game: Requiring Campaign Finance Disclosure in the Face of Tribal Sovereign Immunity, 20 B. U. Pub. Interest

L. J. 1 (2010).

In sum, any number of Indian tribes across the country have emerged as substantial and successful competitors in interstate and international commerce, both within and beyond Indian lands. As long as tribal immunity remains out of sync with this reality, it will continue to invite problems, including *de facto* deregulation of highly regulated activities; unfairness to tort victims; and increasingly fractious relations with States and individuals alike. The growing harms wrought by *Kiowa*'s unjustifiable rule fully justify overruling it.

## B

In support of its adherence to *stare decisis*, the majority asserts that "Congress has now reflected on *Kiowa*" and has decided to "retain" the decision. *Ante,* at 18; see also *ante,* at 19 ("[W]e act today against the backdrop of an apparent congressional choice: to keep tribal immunity . . . in a case like this one"). On its face, however, this is a curious assertion. To this day, Congress has never granted tribal sovereign immunity in *any* shape or form—much less immunity that extends as far as *Kiowa* went. What the majority really means, I gather, is that the Court must stay its hand because Congress has implicitly approved of *Kiowa*'s rule by *not* overturning it.

This argument from legislative inaction is unavailing. As a practical matter, it is "'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of" one of this Court's decisions. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 175, n. 1 (1989) (quoting *Johnson* v. *Transportation Agency, Santa Clara Cty.*, 480 U. S. 616, 672 (1987) (SCALIA, J., dissenting)); see also *Girouard* v. *United States*, 328 U. S. 61, 69 (1946) ("It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law"); *Helvering* v. *Hallock*, 309 U. S. 106,

121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle"). There are many reasons Congress might not act on a decision like *Kiowa*, and most of them have nothing at all to do with Congress' desire to preserve the decision. See *Johnson,* 480 U. S., at 672 (SCALIA, J., dissenting) (listing various kinds of legislative inertia, including an "inability to agree upon how to alter the status quo" and "indifference to the status quo").

Even assuming the general validity of arguments from legislative inaction, they are a poor fit in this common-law context. Such arguments are typically based on the premise that the failure of later Congresses to reject a judicial decision interpreting a statute says something about what Congress understands the statute to mean. See, *e.g., id.,* at 629, n. 7 (majority opinion). But it is not clear why Congress' unenacted "opinion" has any relevance to determining the correctness of a decision about a doctrine created and shaped by this Court. Giving dispositive weight to congressional silence regarding a common-law decision of this Court effectively codifies that decision based only on Congress' failure to address it. This approach is at odds with our Constitution's requirements for enacting law. Cf. *Patterson, supra,* at 175, n. 1 ("Congress may legislate . . . only through the passage of a bill which is approved by both Houses and signed by the President. Congressional inaction cannot amend a duly enacted statute" (citation omitted)). It is also the direct opposite of this Court's usual approach in common-law cases, where we have made clear that, "in the absence of an applicable Act of Congress, federal courts must fashion the governing rules." *National Metropolitan Bank*, 323 U. S., at 456; see also *supra,* at 11–12; *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375, 378 (1970) (precedent barring recovery for wrongful death, "somewhat dubious even when rendered, is such an unjustifiable anomaly in the present maritime

[common] law that it should no longer be followed").[5] Allowing legislative inaction to guide common-law decisionmaking is not deference, but abdication.[6]

 In any event, because legislative inaction is usually

_____

 [5] The majority appears to agree that the Court can revise the judicial doctrine of tribal immunity, because it reserves the right to make an "off-reservation" tort exception to *Kiowa*'s blanket rule. See *ante*, at 16, n. 8. In light of that reservation, the majority's declaration that it is "Congress's job . . . to determine whether or how to limit tribal immunity" rings hollow. *Id.,* at 17. Such a judge-made exception would no more defer to Congress to "make the call whether to curtail a tribe's immunity" than would recognizing that *Kiowa* was wrongly decided in the first instance. *Id.,* at 18. In any event, I welcome the majority's interest in fulfilling its independent responsibility to correct *Kiowa*'s mistaken extension of immunity "without any exceptions for commercial or off-reservation conduct." *Id.,* at 15. I regret only that the Court does not see fit to take that step today.

 [6] Of course, *stare decisis* still applies in the common-law context; I reject only the notion that arguments from legislative inaction have any place in the analysis.

 I also reject the majority's intimation that *stare decisis* applies as strongly to common-law decisions as to those involving statutory interpretation. The majority asserts that *stare decisis* should have "'special force'" in this case because "'Congress remains free to alter what we have done.'" *Ante*, at 16 (quoting *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989)). Although the Court has invoked this reasoning in the statutory context, I am not aware of a case in which we have relied upon it to preserve a common-law decision of this Court. Indeed, we have minimized that reasoning when interpreting the Sherman Act precisely because "the Court has treated the Sherman Act as a *common-law* statute." *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 899 (2007) (emphasis added); see also *State Oil Co.* v. *Khan*, 522 U. S. 3, 20–21 (1997) ("[T]he general presumption that legislative changes should be left to Congress has less force with respect to the Sherman Act in light of the accepted view that Congress 'expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition'"). Surely no higher standard of *stare decisis* can apply when dealing with common law proper, which Congress certainly expects the Court to shape in the absence of legislative action. See, *e.g., National Metropolitan Bank* v. *United States*, 323 U. S. 454, 456 (1945).

indeterminate, we "'require very persuasive circumstances enveloping Congressional silence to debar this Court from reexamining its own doctrines.'" *Girouard*, *supra,* at 69. Here, the majority provides nothing that solidifies the inference of approval it draws from congressional silence in the wake of *Kiowa.*

First, the majority cites two Senate bills that proposed to abrogate tribal immunity for contract and tort claims against tribes. See S. 2299, 105th Cong., 2d Sess. (1998) (contract claims); S. 2302, 105th Cong., 2d Sess. (1998) (tort claims). Neither bill expresses Congress' views on *Kiowa*'s rule, for both died in committee without a vote.

Second, the majority notes various post-*Kiowa* enactments that either abrogate tribal immunity in various limited contexts or leave it be. See *ante*, at 18, 19, n. 10. None of these enactments provides a reason to believe that Congress both considered and approved *Kiowa*'s holding. None of them targets with any precision the immunity of Indian tribes for off-reservation commercial activities. See, *e.g.,* Indian Tribal Economic Development and Contract Encouragement Act of 2000 (codified at 25 U. S. C. §81(d)(2)) (for contracts that encumber *Indian lands* for more than seven years, tribes must either provide for breach-of-contract remedies or disclose tribal immunity if applicable). And given the exceedingly narrow contexts in which these provisions apply, see, *e.g.,* Arizona Water Settlements Act, §213(a)(2), 118 Stat. 3531 (abrogating one tribe's immunity for the limited purpose of enforcing water settlements), the far stronger inference is that Congress simply did not address *Kiowa* or its extension of immunity in these Acts; rather, Congress considered only whether an abrogation of judge-made tribal immunity was necessary to the narrow regulatory scheme on the table. See, *e.g.,* Prevent All Cigarette Trafficking Act of 2009, §§2(e), 3(a), 124 Stat. 1101, 1108.

The majority posits that its inference of congressional

approval of *Kiowa* is stronger because Congress failed to act after the *Kiowa* Court "urg[ed]" Congress to consider the question presented. *Ante,* at 17, 19–20 (quoting *Kiowa*, 523 U. S., at 758) ("[W]e defer to the role Congress may wish to exercise in this important judgment"). But this circumstance too raises any number of inferences. Congress is under no obligation to review and respond to every statement this Court makes; perhaps legislative inertia simply won out. The majority seems to suggest that Congress understood *Kiowa* to assign the burgeoning problems of expansive common-law immunity to the Legislature, and then chose to let those problems fester. But Congress has not explained its inaction, and we should not pretend that it has done so by remaining silent after we supposedly prodded it to say something. Even if we credit the relevance of post-*Kiowa* congressional silence in this common-law context—and I do not—there is certainly not enough evidence of congressional acquiescence here "that we can properly place on the shoulders of Congress the burden of the Court's own error." *Girouard*, 328 U. S., at 69–70.

C

The majority's remaining arguments for retaining *Kiowa* are also unconvincing.

First, the majority characterizes *Kiowa* as one case in a "long line of precedents" in which the Court has recognized tribal immunity "without any exceptions for commercial or off-reservation conduct." *Ante*, at 15. True, the Court has relied on tribal immunity as a general matter in several cases. But not until *Kiowa* were we required to decide whether immunity should extend to commercial activities beyond Indian reservations. See *supra,* at 7. And after *Kiowa*, we have mentioned it only once, and then only in dicta. *C & L Enterprises, Inc.* v. *Citizen Band Potawatomi Tribe of Okla.*, 532 U. S. 411, 418 (2001) (holding that the

Tribe had waived its immunity in a construction contract). Thus, overturning *Kiowa* would overturn *Kiowa* only.

Second, the majority suggests that tribes and their business partners have now relied on *Kiowa* in structuring their contracts and transactions. *Ante*, at 15. But even when *Kiowa* extended the scope of tribal immunity, it was readily apparent that the Court had strong misgivings about it. Not one Member of the *Kiowa* Court identified a substantive justification for its extension of immunity: Three would not have expanded the immunity in the first place, *Kiowa*, 523 U. S., at 760 (Stevens, J., dissenting), and the other six essentially expressed hope that Congress would overrule the Court's decision, see *id.,* at 758–759. Against that backdrop, it would hardly be reasonable for a tribe to rely on *Kiowa* as a permanent grant of immunity for off-reservation commercial activities. In any event, the utter absence of a reasoned justification for *Kiowa*'s rule and its growing adverse effects easily outweigh this generalized assertion of reliance. See, *e.g., Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 906 (2007) (in the antitrust context, overturning the *per se* rule against vertical price restraints in part because the "reliance interests" in the case could not "justify an inefficient rule").

\*     \*     \*

In *Kiowa*, this Court adopted a rule without a reason: a sweeping immunity from suit untethered from commercial realities and the usual justifications for immunity, premised on the misguided notion that only Congress can place sensible limits on a doctrine we created. The decision was mistaken then, and the Court's decision to reaffirm it in the face of the unfairness and conflict it has engendered is doubly so. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–515

_____

## MICHIGAN, PETITIONER *v.* BAY MILLS INDIAN COMMUNITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 27, 2014]

JUSTICE GINSBURG, dissenting.

I join JUSTICE THOMAS' dissenting opinion with one reservation. *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751 (1998), held for the first time that tribal sovereign immunity extends to suits arising out of an Indian tribe's off-reservation commercial activity. For the reasons stated in the dissenting opinion I joined in *Kiowa*, *id.,* at 760–766 (opinion of Stevens, J.), and cogently recapitulated today by JUSTICE THOMAS, this Court's declaration of an immunity thus absolute was and remains exorbitant. But I also believe that the Court has carried beyond the pale the immunity possessed by States of the United States. Compare *ante,* at 3, n. 3 (THOMAS, J., dissenting), with *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 100 (1996) (Souter, J., dissenting) ("[T]he Court today holds for the first time since the founding of the Republic that Congress has no authority to subject a State to the jurisdiction of a federal court at the behest of an individual asserting a federal right. . . . I part company from the Court because I am convinced its decision is fundamentally mistaken."); *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 93 (2000) (Stevens, J., dissenting in part and concurring in part) ("Congress' power to authorize federal remedies against state agencies that violate federal statutory obligations is coextensive with its power

to impose those obligations on the States in the first place. Neither the Eleventh Amendment nor the doctrine of sovereign immunity places any limit on that power."); *Alden* v. *Maine*, 527 U. S. 706, 814 (1999) (Souter, J., dissenting) (court's enhancement of the States' immunity from suit "is true neither to history nor to the structure of the Constitution").   Neither brand of immoderate, judicially confirmed immunity, I anticipate, will have staying power.